# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DARRYL MCCLUNG, *et. al.*,                )
                                          )
        Plaintiffs,                )   Civil Action No. 2:12-cv-341
                                          )
v.                                        )   Judge Mark R. Hornak
                                          )
SONGER STEEL SERVICES, INC.,              )
                                          )
        Defendant.                 )

## OPINION

**Mark R. Hornak, United States District Judge**

In this race discrimination suit, claims based solely on permissible inferences square off against an essentially vaporous defense on the summary judgment battlefield.

Plaintiff, Robert Smiley, Jr. ("Mr. Smiley"), alleges that Defendant Songer Steel Services, Inc. ("Songer Steel"), fired him because he is African American, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.*, The Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended; and Section 5(a) of the Pennsylvania Human Relations Act, 42 P.S. §§ 951-963. The parties have extensively briefed the Defendant's Motion for Summary Judgment, ECF No. 20, and the Court's deliberations have been aided by the oral argument presented by counsel. After consideration of Defendant's Motion, the various filings in support and opposition thereto, the relevant case law, and the record as a whole, the Court concludes that genuine issues of material fact remain, and therefore, for the reasons that follow, Defendant's Motion is denied.

## I.    BACKGROUND

The material facts are straightforward, and the parties agree on the following of them. Plaintiff Mr. Smiley was employed as a journeyman laborer at Defendant Songer Steel's

construction project at U.S. Steel – Clairton Coke Works ("Project") in Clairton, Pennsylvania. Def.'s Concise Statement of Material Facts ("Def.'s Stat. Facts") ¶ 1. Songer Steel employed union-represented bricklayers, ironworkers, and laborers on the Project, with the laborers and bricklayers scheduled in two work shifts, a day shift and a night shift. *Id.* at ¶ 2. Jim Leadbitter ("Mr. Leadbitter") and Justin Korotko ("Mr. Korotko") were the two night shift Laborer Foremen. *Id.* at ¶ 3. Mr. Leadbitter and Mr. Korotko reported to General Foreman Dean Kutemeier ("Mr. Kutemeier"), the night shift Laborer General Foreman. *Id.* Under the Laborers Local Union procedures, laborers were allowed to solicit their own hiring instead of relying exclusively on referrals from the union. *Id.* at ¶ 4. After hiring the initial complement of laborers on the Project in September of 2010, all subsequent Songer Steel hiring was based on referrals from the Laborers Local Union. *Id.*

In early September of 2010, Mr. Smiley discussed employment on the Project in a phone conversation with Mr. Kutemeier. *Id.* at ¶ 5. Mr. Kutemeier offered Mr. Smiley a position for the second, or night, shift. *Id.* Mr. Smiley first met Mr. Kutemeier several days later at the Project site on September 7, 2010, and went through Songer Steel's orientation process for new hires. *Id.* at ¶ 6. Songer Steel avers that Mr. Smiley was hired on September 7, 2010, while Mr. Smiley avers that Mr. Kutemeier had already hired Mr. Smiley on September 5, 2010 during their initial phone conversation. Pl.'s Responsive Concise Statement ("Pl.'s Stat. Facts") ¶ 6. Mr. Smiley was laid off on November 4, 2010. Def.'s Stat. Facts ¶ 7.

From September 7, 2010 to November 4, 2010, the night shift laborers were split into two crews, one led by Foreman Korotko and the other by Foreman Leadbitter. *Id.* at ¶ 8. Mr. Smiley was assigned to a crew of eight to ten laborers on the night shift led by Mr. Leadbitter. *Id.* The two laborer crews typically worked 20 to 30 feet apart, and for some periods they worked on

2

different coke batteries. *Id.* at ¶ 9. The applicable labor agreement for the Project laborers was the National Maintenance Agreement ("NMA"). *Id.* at ¶ 10. The NMA does not require hiring, job assignments, layoffs, or recalls to be governed by seniority. *Id.* Article XXI of the NMA also provides that crew sizes "shall be increased or decreased at the discretion of the Employer," and Article XXIII gives the Employer the right to "lay off employees and supervision [sic] because of lack of work or for other legitimate reasons." *Id.*

The coke battery renovation work was performed in phases as the work progressed through the sections of the batteries. *Id.* at ¶ 21. On October 29, 2010, when the second phase of the work involving demolition of the top of the battery started, Songer Steel hired three additional laborers. *Id.* An increase of laborers to help with the demolition, or "tear-out," was common practice for this type of work. *Id.* More specifically, it was common practice to hire three or so additional workers and lay off those workers three, four, or five days later, when the tear-out was completed. *Id.* It was also common practice that the extra laborers hired for the tear-out work were not those necessarily laid off when the work was completed. *Id.* On November 4, 2010, when the tear-out work was completed, three second-shift laborers were laid off: Mr. Smiley, Mr. Darryl McClung (who was also African-American), and Mr. Richard Pierce, a white laborer. *Id.*

Mr. Pierce was first hired at the Project on October 29, 2010 (less than a week before he was laid off), as one of the three laborers hired for the tear-out. *Id.* at ¶ 39. Songer Steel then rehired Mr. Pierce on December 14, 2010. *Id.* Mr. Leadbitter had worked with Mr. Pierce before the Project, and believed that Mr. Pierce was a "good worker." *Id.* at ¶ 40. The parties do not dispute that Mr. Leadbitter recommended to Mr. Kutemeier that Mr. Pierce be rehired after his November 4, 2010 layoff. *Id.*

3

The parties do dispute the following facts. Defendant contends that "according to Leadbitter's assessment, Smiley's work performance was not as good as the other laborers and Smiley was not getting enough work done." *Id.* at ¶ 12. Defendant avers that Mr. Leadbitter saw Mr. Smiley and Mr. McClung sitting down on the job when they should have been working. *Id.* at ¶ 13. Mr. Smiley denies this. Pl.'s Stat. Facts ¶¶ 12, 13 (quoting Leadbitter Dep. 40:5-14, Ex. 2).

According to the Defendant, when Mr. Leadbitter saw Mr. Smiley sitting down on the job while others in the crew were working, it was not in a rest area or break area; it was in a job site work area where Mr. Smiley was supposed to be working. Def.'s Stat. Facts ¶ 14. Defendant contends that Mr. Leadbitter "said something" to Mr. Smiley when Mr. Smiley was sitting down without permission, but Mr. Leadbitter cannot remember the exact details of what he said. Def.'s Stat. Facts ¶ 16.

The parties do not dispute that it was Mr. Leadbitter's practice as a supervisor to approach any worker, regardless of whether or not they were in his crew, if he saw them sitting down on the job while others were working, in order to determine why they were sitting down because, according to Mr. Leadbitter, "if you're there to work, you're there to work. You're not sitting down." Def.'s Stat. Facts ¶ 17. Nor do the parties dispute that Mr. Kutemeier, Mr. Korotko, and Mr. Leadbitter met on a regular basis, along with Superintendent Joseph Rodriguez, *id.* at ¶ 18, or that Mr. Kutemeier generally oversaw the laborers' work, and was present in the laborers' work area every night for between three to eight hours each shift, *id.* at ¶ 19. It is undisputed that Mr. Korotko never saw Mr. Smiley's work, never worked with Mr. Smiley, Def.'s Reply ¶ 10, and has no recollection of Mr. Smiley's name being mentioned in any co-worker's complaints, *id.* at ¶ 11.

4

Further, the parties agree that the decision as to which three laborers to lay off on November 4, 2010 was made after discussions among General Foreman Kutemeier and the two Laborer Foremen, Mr. Leadbitter and Mr. Korotko, during which Mr. Kutemeier sought Mr. Leadbitter and Mr. Korotko's input. *Id.* at ¶ 22. Mr. Kutemeier stated in his affidavit that he based his belief on the recommendations of Mr. Leadbitter and Mr. Korotko, and what he himself observed. *Id.* at ¶ 26.

However, Mr. Smiley avers that Mr. Kutemeier never told him that his work ethic or performance was lacking, and Mr. Leadbitter never reprimanded Mr. Smiley nor spoke to him about working too slowly. *Id.* Further, Mr. Smiley avers that he asked Mr. Leadbitter for extra work to do. *Id.* Plaintiff denies that Mr. Leadbitter did not treat any worker differently because of their race, alleging instead that while other laborers rested, Mr. Leadbitter would pick out Mr. Smiley and assign him extra work to do. *Id.* at ¶ 29 (admitted by Defendant at Def.'s Reply and Objections to Pl.'s Responsive Concise Statement of Other Material Facts ("Def.'s Reply") ¶ 4).

Moreover, when Safety Inspector John Bordas ("Mr. Bordas") asked Mr. Smiley why he worked the way he did while other laborers were sitting down, Mr. Smiley explained that "as a black man," in order to fit in and prove himself to the others, he had to do extra work so that the others would not "look at him in a certain fashion." *Id.* at ¶ 6. While Defendant admits that Mr. Bordas observed that Mr. Smiley went "above and beyond what was required for his job and that Smiley's work was superior to other laborers," Defendant contends that Mr. Bordas had limited personal knowledge of Mr. Smiley's work. *Id.* at ¶ 7.

Mr. Smiley ultimately alleges that his two Songer Steel supervisors, Mr. Kutemeier and Mr. Leadbitter, discriminated against him on the basis of his race. Def.'s Stat. Facts ¶ 36. Notably, the parties agree that there were no racial comments or any negative or derogatory

5

statements based on race attributable to any of the supervisors or managers involved in the layoff decisions. Def.'s Stat. Facts ¶ 30. Mr. Smiley raised no concerns or complaints to anyone at Songer Steel about any harassment or discrimination, *id.* at ¶ 32, and did not ask any of his union representatives to file a grievance on his behalf to challenge his layoff, *id.* at ¶ 34.

On December 13, 2010, Mr. Smiley filed a charge against Songer Steel with the Pennsylvania Human Relations Commission ("PHRC"), and this charge was dual-filed with the Equal Employment Opportunity Commission ("EEOC"). Pl.'s Compl. ¶ 4. On March 20, 2012, Plaintiffs Mr. McClung, Mr. Richard Prater (a bricklayer laid off on September 29, 2010), and Mr. Smiley filed suit in this Court against Songer Steel, alleging in Count I, "Violation of Title VII – Race," in Count II, "Violation of PHRA – Race," and in Count III, "Violation of Section 1981." On March 12, 2013, this Court granted Plaintiff Mr. Prater's Stipulation of Dismissal, such that Mr. Prater's case against Songer Steel was dismissed with prejudice. *See* ECF No. 17. On March 26, 2013, this Court granted Plaintiff Mr. McClung's Stipulation of Dismissal, such that Mr. McClung's case against Songer Steel was dismissed with prejudice, leaving Mr. Smiley as the sole remaining Plaintiff as to whom Songer Steel filed its April 26, 2013 Motion for Summary Judgment. *See* ECF No. 19.

## II. DISCUSSION

### a. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250 (1986). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Huston v. Procter & Gamble Paper Products Corp.,* 568 F.3d 100, 104 (3d Cir. 2009). A fact is material if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See Anderson,* 477 U.S. at 247–48.

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v.* Sanderson *Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587–88; *Huston,* 568 F.3d at 104 (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson,* 477 U.S. at 255; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir.2004); *Boyle v. Cnty. of Allegheny,* 139 F.3d 386, 393 (3d Cir.1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 247–48. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *See Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 589 (3d Cir.2005) (citing *Celotex Corp.,* 477 U.S. at 323–24).

### b.     Unlawful Racial Discrimination Under Title VII

For purposes of deciding this Motion, the same legal standards apply to employment discrimination claims brought pursuant to 42 U.S.C. § 1981, Title VII, and the PHRA. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181 (3d Cir. 2009) (same analysis applies to § 1981 and Title VII claims); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 n. 3 (3d Cir. 2000) (equating Title VII and PHRA analysis). As to each claim, ultimately, Plaintiff must prove that Defendant Songer Steel treated him less favorably because of his race. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-93 (2003); *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977). Title VII provides, in pertinent part, that "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). The parties do not dispute that during the period of time relevant to this case, Songer Steel was an "employer" subject to Title VII's provisions, 42 U.S.C. § 2000e(b), and Mr. Smiley was an "employee" entitled to statutory protection from race-based discrimination, 42 U.S.C. § 2000e(f).

Racial discrimination may be established by direct[1] or indirect evidence. *E.E.O.C. v. Hall's Motor Transit Co.*, 789 F.2d 1011, 1015 (3d Cir. 1986). Since this is an employment discrimination case in which no direct evidence of discrimination is presented, the Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the pending Motion.

---

[1] "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's *prima facie* case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995).

The *McDonnell Douglas* analysis proceeds in three steps. First, the plaintiff must establish a *prima facie* case of illegal discrimination. *McDonnell Douglas,* 411 U.S. at 802. Second, if the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant who must articulate[2] a legitimate, nondiscriminatory reason for treating the plaintiff in an adverse manner. *Id.* at 802–803; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577 (1978) (a *prima facie* case "raises an inference of discrimination" sufficient to shift the burden of production to the defendant); *Burdine,* 450 U.S. at 254–255. Third, if the defendant articulates a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reason given by the defendant for such treatment is merely a pretext for unlawful employment discrimination, i.e., a discriminatory animus was the real reason for the adverse employment action at issue. *McDonnell Douglas,* 411 U.S. at 804–805; *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994).

Specifically, to defeat summary judgment when the defendant articulates a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment, "a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764 (emphasis in original). Therefore, "if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Id.*

---

[2] To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509 (1993).

While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 252–53. The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous, *Burdine,* 450 U.S. at 253, and the elements of a *prima facie* case depend on the facts of the particular case, *see Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999); *Sarullo v. United States Postal Service,* 352 F.3d 789, 797–98 (3d Cir. 2003) (the *prima facie* inquiry "remains flexible and must be tailored to fit the specific context in which it is applied").

To establish a *prima facie* case at the summary judgment stage, "the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case." *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001). Generally speaking, in order to establish a *prima facie* case of racial discrimination, the plaintiff must demonstrate that: (1) he was a member of a statutorily-protected class; (2) he was qualified for the position at issue; (3) he was aggrieved by an adverse employment action, such as being fired or not hired; and (4) similarly situated persons who were not members of his protected class were treated more favorably, or there are other circumstances giving rise to an inference of racial discrimination. *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 233 (3d Cir. 1987), *cert. denied,* 484 U.S. 1020 (1988); *Jones*, 198 F.3d at 410-411; *Burdine*, 450 U.S. at 258.

### c.    Prima Facie Case

Here, Defendant Songer Steel concedes that "the first three elements [of the *prima facie* case] are not disputed." Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem") at 11. Instead, Defendant contends that Mr. Smiley cannot establish the fourth element "because (1) no similarly situated persons outside his protected class were treated more favorably; and (2) the

circumstances of the common practice and frequency of layoffs at the Project refute any inference Smiley was a victim of discrimination simply because he was one of many laid off." *Id.*

At the summary judgment stage, the burden rests with Mr. Smiley to demonstrate both that he and his identified comparator are "similarly situated," and that his comparator was treated more favorably. *See Warfield v. SEPTA*, 460 Fed. Appx. 127, 130 (3d Cir. 2012) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998)). "Though 'similarly situated' does not mean 'identically situated,' a plaintiff must demonstrate that she is similar to the alleged comparator in relevant respects." *Id.* at 130 (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003)). "In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson*, 142 F.3d at 639 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992)).

In particular, "the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion." *Simpson*, 142 F.3d at 647 (citing *Fuentes*, 32 F.3d at 767); *compare Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331-32 (3d Cir. 1995) (finding that plaintiff's receipt of performance bonus raised issue of fact as to whether employer's performance-based explanation for discharging plaintiff was pretext) *with Ezold*, 983 F.2d at 528-29 (finding that plaintiff's abilities in areas other than legal analysis not relevant in determining of law firm's legal analysis explanation for not promoting plaintiff was

11

pretext)). The issue of discriminatory treatment of similarly-situated employees arises both as part of the plaintiff's *prima facie* case and in the pretext analysis. *Simpson*, 142 F.3d at 644-45.

Here, both Mr. Smiley and Mr. Pierce were employed as second-shift laborers at Defendant Songer Steel's construction project at U.S. Steel – Clairton Coke Works, in Clairton, Pennsylvania, Def.'s Stat. Facts ¶¶ 1, 5, 39, and as such, were listed with identical job titles in Songer Steel's Employee List and Clairton Laborer List, *see* Def.'s Ex. F, G. Songer Steel identifies these two individuals' work performance as "the particular criteria or qualification" that was behind its reason to terminate Mr. Smiley's employment and not recall him, like they did Mr. Pierce. However, Songer Steel's contention that Mr. Smiley and Mr. Pierce were not similarly situated because Mr. Pierce had no negative performance reviews misses the mark because it instead points to Songer Steel's alleged dissimilar *treatment* of Mr. Smiley, a black second-shift laborer, and Mr. Pierce, a white second-shift laborer, and does not point to Mr. Smiley and Mr. Pierce being dissimilarly *situated* as employees.[3]

Moreover, the fact that Mr. Pierce had been working on the job only six days before he was fired, whereas Mr. Smiley had been working on the job for nearly two months, is not fatal to Plaintiff's claim that the two laborers are similarly situated because the standard is that the comparator be "similar," not identical. *See Warfield*, 460 Fed. Appx. at 130. Mr. Smiley and Mr. Pierce were indeed hired at different times to do identical work at the same Songer Steel facility. Further, that Mr. Smiley had worked at Songer Steel longer than Mr. Pierce simply begs the question as to why, if Mr. Smiley was such a poor worker, he wasn't laid off much earlier,

---

[3] In some ways, Songer Steel's argument is circular, since the next "logical" step in this mode of analysis would be that Messrs. Smiley and Pierce were not "similarly situated" because one was recalled and the other was not. Under this analytical model, no plaintiff could ever be found to be similarly situated to a better-treated comparator in any discharge/failure-to-rehire case in which the employer claims that the plaintiff's performance was less satisfactory than that of better-treated employees. Under this approach, every such claim would fail *ab initio*.

given Songer Steel's stated common pattern and practice as to layoffs.[4] Ultimately, Plaintiff has identified sufficient record evidence from which a factfinder could reasonably infer that similarly situated persons who were not members of Mr. Smiley's protected class were treated more favorably.

While Songer Steel correctly points out that a Title VII plaintiff cannot establish racial discrimination by singling out one white individual who was treated more favorably when there were other white individuals who were treated less favorably, *Simpson*, 142 F.3d at 646, Mr. Smiley, as this Court will discuss in its analysis of pretext, brings many more genuine issues of material fact to the summary judgment analysis than simply his averments regarding Mr. Pierce. This Court concludes that Mr. Smiley has asserted sufficient record evidence from which a reasonable jury could conclude that similarly situated persons who were not members of Mr. Smiley's protected class were treated more favorably, as well as sufficient record evidence from which a reasonable jury could conclude that Songer Steel's actions were taken under circumstances giving rise to an inference of racial discrimination. In short, he has made out his *prima facie* case.

### d.    Pretext

Defendant's Motion ultimately turns on whether Mr. Smiley has advanced sufficient record evidence for the pretext issue to go to the jury. Under the Third Circuit's decision in

---

[4] Songer Steel avers in its Reply Brief that Mr. Smiley and Mr. Pierce are also dissimilarly situated because the union's referral process was responsible for Mr. Pierce's rehire and not any action of Songer Steel, given that all hiring after September 2010 was via union referrals. However, Songer Steel does little to develop the factual basis behind this averment beyond simply stating it, and the record is quite unclear as to where exactly the union referral ended and Songer Steel's decision to hire Mr. Pierce based on that referral began, or whether the "union referral" system was an exclusive or non-exclusive mode of hire. Thus, Songer Steel, as the employer, could still have had a material role in rehiring Mr. Pierce, such that his rehire was not a random or coincidental event, given that Songer Steel has not advanced a factual record as to why Mr. Pierce's rehire was wholly outside of Songer Steel's hands. *See* Def.'s Reply. Br. in Supp. of Mot. for Summ. J. at 6.

*Fuentes*,[5] the "basic framework under Title VII illustrates that, to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably *either* (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (emphasis in original).

"To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. Instead, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* (emphasis in original). It appears that here, Plaintiff proceeds under both *Fuentes* prongs: he both attacks the credibility of Songer Steel's articulated reason for his termination, and offers additional evidence of Songer Steel's allegedly discriminatory animus against him.

Songer Steel's articulated legitimate reason for its layoff of Mr. Smiley and its failure to recall him is that Mr. Smiley's work performance was not as good as that of the other laborers, in

---

[5] Defendant vigorously sets forth the pretext standard enunciated by the United States Supreme Court in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), that the plaintiff must convince the factfinder "*both* that the reason was false, *and* that discrimination was the real reason," but this is the threshold pretext standard for the plaintiff to prevail at trial. The *Fuentes* court analyzed this very standard and interpreted it in the context of the threshold pretext standard for a plaintiff to prevail against a defendant at the summary judgment stage. *See Fuentes*, 32 F.3d at 764; *see also id.* at 761-62 ("The question before us is the proper standard for granting summary judgment in a claim arising under Title VII in the wake of the Supreme Court's decision in *St. Mary's Honor Center v. Hicks*.").

particular, Mr. Pierce. Def.'s Mem. at 15. As evidence of Mr. Smiley's poor work performance, Songer Steel offers the deposition testimony of night shift Laborer Foreman Leadbitter, the only witness proffered to testify about Mr. Smiley's allegedly lackluster work performance,[6] contending that "based on Leadbitter's observations of his own crew and the other laborer crew, in Leadbitter's assessment Smiley's work performance was not as good as the other laborers." Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 15. Defendant attempts to bolster this argument by averring that General Foreman Kutemeier chose "Mr. Smiley to be laid off on November 4, 2010 because he believed [Mr. Smiley was] not working as hard as the others during the weeks that preceded the layoff." *Id.* (citing Mr. Kutemeier's affidavit).

However, the deposition testimony of Mr. Leadbitter is at best nebulous, and at worst, consistently lacking in factual foundation, presenting only Mr. Leadbitter's conditional knowledge of any allegedly subpar work performance by Mr. Smiley – not personal knowledge.[7] After Plaintiff's counsel asked Mr. Leadbitter whether he had "any recollection of any specifics with any particular person at this point," before Mr. Leadbitter was even questioned about Mr. Smiley, Mr. Leadbitter expressly stated "[n]o, not two years ago." Leadbitter Dep. 19:7-10, December 5, 2012, ECF No. 20-5. Indeed, Mr. Leadbitter's failure to recollect specifics is the thread that binds his testimony about Mr. Smiley:

> Q:     You told me . . . that you didn't remember telling anyone that Mr. Smiley wasn't doing enough work or that he needed to work harder or be more productive. Is that still accurate looking at him now?

---

[6] As noted in the Statement of Facts, above, it is undisputed that Mr. Korotko never saw Mr. Smiley's work, never worked with Mr. Smiley, Def.'s Reply ¶ 10, and has no recollection of Mr. Smiley's name being mentioned in any co-worker's complaints, *id.* at ¶ 11.

[7] Defendant's proffer of Mr. Leadbitter as a witness in this regard strikes the Court as perhaps a bit of unbridled optimism. Under Federal Rule of Evidence 602, "a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," which is hardly a conclusion that is self-evident after reviewing with care Mr. Leadbitter's deposition testimony.

A:     Yeah, I don't know. Like I said, I mean, I might have said something to Dean [Kutemeier]. It's just been – two years is too long. I can't remember exact details and everything else.

\*    \*    \*

A:     Like I said, I can't remember, you know. I can't remember exactly, but you know, I mean, I remember the times, you know, maybe not as good as the others. . . . Just like I said, you know, maybe not getting enough work done or something wasn't done, whatever.

*Id.* at 26:18-27:3, 40:7-14. When Plaintiff's counsel attempted to elicit testimony from Mr. Smiley about the specifics of Mr. Smiley's alleged "slacking off," Mr. Leadbitter's testimony became a veritable matryoshka doll[8] of stacked up inconsistencies and equivocations. "I remember seeing them [Mr. Smiley and Mr. McClung] sitting on the rail bridge, yeah." *Id.* at 27:22-23. He then observed that "sometimes you gotta sit down there and other times you might be sitting there for whatever reason. . . . [M]aybe if you had to get down and get down in the oven to do some work or you're climbing out or waiting on something," *id.* at 28:15-29:2, and added on this latter point: "there was other people sitting down. But, you know, like I said, there's times you gotta sit down to do something or whatever or you're just sitting down because you're not doing what you're supposed to be doing," *id.* at 41:18-23. Then, when pressed for specifics, Mr. Leadbitter's knowledge became even more conditional:

Q:     Did you ever tell Mr. Smiley that you had problems with his work or problems with him sitting down?

A:     Yeah, if he was sitting down, I'm sure I probably said something to him.

\*    \*    \*

A:     It's been two years. I can't remember exact details. If somebody was sitting down, I'm sure –

---

[8] A matroyshka doll, often seen at arts and crafts fairs during the holiday season, "refers to a set of wooden dolls of decreasing size placed one inside the other. The first Russian nested doll set was carved in 1890 by Vasily Zvyozdochkin from a design by Sergey Malyutin, who was a folk crafts painter at Abramtsevo." http://en.wikipedia.org/wiki/Matryoshka_doll

Q:     That's what you would have done?

A:     Right.

*Id.* at 43:15-44:2. In effect, the only clear take-aways from Mr. Leadbitter's testimony are (1) his lack of memory regarding any specifics of Mr. Smiley's work performance, and (2) his acknowledgment that at times it was perfectly legitimate to be sitting down in the work area while others worked. À la *Fuentes*, Mr. Leadbitter's testimony demonstrates "such inconsistencies" in Songer Steel's articulated nondiscriminatory reason of Mr. Smiley's poor work performance that a jury could find this articulated reason unworthy of credence.

Songer Steel does attempt to bolster its articulated nondiscriminatory reason with the assertion that in deciding to fire Mr. Smiley, Mr. Kutemeier did not simply rely on Mr. Leadbitter's recommendation but also relied on "what he [Mr. Kutemeier] observed." Def.'s Mem. at 15. However, Songer Steel has offered only Mr. Kutemeier's six-paragraph, December 15, 2012 affidavit in support of its far-reaching averment that Mr. Kutemeier made an independent assessment of Mr. Smiley's work performance that purportedly informed his decision to lay off Mr. Smiley and not rehire him.

All this affidavit provides in this regard is a single paragraph in which Mr. Kutemeier states that "I chose Mr. McClung and Mr. Smiley to be laid off on November 4, 2010 because I believed they were not working as hard as the others during the weeks that preceded the layoff. I based my belief on the recommendations of Jim Leadbitter and Justin Korotko *and what I saw*." Def.'s App. D, ¶ 5 (emphasis added). While Plaintiff did admit as undisputed Songer Steel's Material Fact No. 19, that Mr. Kutemeier "observed the laborers work" and "was present in the laborers' work area every night for between 3-8 hours each shift," Pl.'s Stat. Facts ¶ 19, this admission does nothing to demonstrate exactly what Mr. Kutemeier observed about Mr. Smiley

to cause him to make such a purportedly independent negative assessment of Mr. Smiley's work performance.[9] That Mr. Kutemeier saw "something," or was in a position to "observe workers" is not enough.[10]

Further still, Mr. Kutemeier stated in his affidavit that he "d[id] not remember whether Mr. Leadbitter or Mr. Korotko told [him] about Mr. McClung or Mr. Smiley doing anything wrong," *id.* at ¶ 6, which appears to directly contradict the preceding paragraph of his affidavit. As Plaintiff points out, Defendant's argument requires this Court to assume, pretty much out of whole cloth, that Mr. Kutemeier not only "saw something," which is the most his affidavit could support, but that the "something" was Mr. Smiley at the work site not performing up to par to such a degree that Mr. Smiley's performance warranted termination of his employment. *See* Pl.'s Mem. at 10. There is simply no record evidence offered by Songer Steel to support such assertions.[11]

---

[9] The Court cannot discern whether this is imprecise wording, or intentional caginess, in presenting Mr. Kutemeier's sworn statement. Either way, he never says "what [he] saw."

[10] Why is this so? Consider this example. Many people observe three to five hours of the Pittsburgh Steelers playing football each Sunday from September through (hopefully) January into early February. That reality is not sufficient to demonstrate that they actually observed whether a particular offensive lineman, did, or did not, hold his opponent on a particular play from scrimmage.

[11] Even if Mr. Kutemeier did actually observe Mr. Smiley on the job, there is "no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect," nor does the alleged independent investigation of Mr. Kutemeier somehow relieve the Songer Steel of potential liability when, as Mr. Leadbitter testified and Mr. Kutemeier claimed in his affidavit, Mr. Leadbitter's report to Mr. Kutemeier informed Mr. Kutemeier's decision to lay off Mr. Smiley and not rehire him. *Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1193 (2011). Indeed, "[i]f a supervisor performs an act motivated by discriminatory animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id.* at 1194 (emphasis in original); *see Abramson*, 260 F.3d at 286 (recognizing that "it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate"). In other words, if Mr. Leadbitter indeed acted with discriminatory animus and that animus informed his decision to recommend to Mr. Kutemeier that Mr. Smiley be fired, Songer Steel would not automatically be off the hook for Mr. Smiley's ultimate firing by Mr. Kutemeier (which he admitted was based in part on Mr. Leadbitter's recommendation), regardless of any purportedly independent investigation by Mr. Kutemeier, given Mr. Kutemeier's stated reliance on Mr. Leadbitter.

Given this rather wide evidentiary gap, this Court harbors grave doubts that the Defendant has fulfilled its otherwise extra-light obligations under the second prong of the *McDonnell Douglas* analysis. *See Burdine*, 450 U.S. at 254. No matter how light Songer Steel's burden of production is under this prong, it is not weightless, since "[t]he defendant must clearly set forth, *through the* introduction *of admissible evidence*, the reasons for plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992) (quoting *Burdine*, 450 U.S. at 255-56) (emphasis added).

Here, what emerges from Mr. Leadbitter's testimony is, at best, his wholly uncertain and conditional knowledge of Plaintiff's allegedly subpar work performance. The sweeping, yet essentially unsupported, generalities in Mr. Kutemeier's affidavit do little more to suggest a "legally-sufficient [explanation] to justify a judgment for the defendant." *See Ezold*, 983 F.2d at 523.[12] Because of the deficiency in Songer Steel's proffered non-discriminatory reason, this Court would be inclined to conclude that Songer Steel has not met even its minimal burden of production at this *McDonnell Douglas* step. However, even if this Court were to find that Songer Steel had met its burden, Mr. Smiley's disparate treatment claim would survive summary judgment because Mr. Smiley has satisfied his burden at the third step of the *McDonnell Douglas* analysis.

Forging on, Mr. Smiley has also provided Safety Inspector John Bordas's deposition testimony and the sworn affidavits of Mr. Smiley's coworkers that contradict Songer Steel's

---

[12] Based on the Third Circuit's admonitions in *Ezold*, at least prior to the 2010 amendments to the notice provisions Federal Rule of Civil Procedure 56, consideration of granting summary judgment for the nonmovant (Plaintiff) would have been this Court's next move. *See Keller v. Oriz Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (noting that in an employer's Title VII motion for summary judgment, as to the second prong of *McDonnell Douglas*, "[i]f the defendant cannot satisfy this burden, judgment must be entered for the plaintiff."). However, under the amended Rule 56, a court may grant summary judgment for the nonmovant only "after giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f).

proffered reason for its adverse treatment of Mr. Smiley, and suggest that Mr. Smiley's work performance would have been as good as, if not better than, that of the other laborers. *See* Pl.'s Ex. 11, Mark Lovett Aff., ¶ 4 ("I never saw Mr. McClung or Mr. Smiley slacking off or sitting down on the job, and I never heard anyone else say that they did so."); Pl.'s Ex. 12, Riley Knight Aff., ¶ 5 ("I also never saw Robert Smiley sitting down on a rail bridge."); Pl.'s Ex. 13, Todd Dibler Aff., ¶¶ 4, 6 ("During the time that Mr. McClung and Mr. Smiley were on this job, I never saw either of them sitting on a rail bridge. . . . I remember thinking that I could not believe they were chosen for the layoff, because they both were good workers. Any time anyone needed help, you could always count on them. I believe they were among the top laborers in our crews."); Bordas Dep. 19:21-20:7 ("[Q:] You did view Mr. McClung and Mr. Smiley; didn't you? [A:] Correct." . . . "[A:] Mr. Smiley, I can say I noticed that he went above and beyond. I did not notice that about Mr. McClung.").

While certainly these affidavits cannot be used to simply show that Songer Steel's decision to layoff and not rehire Mr. Smiley was wrong or mistaken, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent," *Fuentes*, 32 F.3d at 765, the assessments of Mr. Smiley's coworkers, and Safety Inspector Bordas, stand in stark contrast in their definiteness and precision to the testimony of the decision-makers, and along with Plaintiff's other proffered evidence, call into question the factual basis behind the Songer Steel's performance evaluation of Mr. Smiley, *see Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1422 (3d Cir. 1991); *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 67 (3d Cir. 1996).

Lastly, the Defendant avers that the common practice and pattern of the ebb and flow of industrial construction project layoffs does not raise any inference of discrimination; to the

contrary, Songer Steel avers that the workforce layoff statistics refute Plaintiff's allegation that Mr. Smiley was singled out for layoff because of his race. *See* Def.'s Mem. at 13. Courts have affirmed the use of statistical evidence in disparate treatment employment discrimination cases, which while not "dispositive" of the presence or absence of discrimination, "may be helpful." *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 767 (3d Cir. 1989) (citing *McDonnell Douglas*, 411 U.S. at 804-05; *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 (1977)). But here, Plaintiff has also pointed to weaknesses in Defendant Songer Steel's statistics that cast doubt on Songer Steel's articulated nondiscriminatory reasons. In particular, Plaintiff notes that while Songer Steel claims that "of the 34 journeyman laborers initially hired [for the Project], 4 were Black, or 11.7% of those laborers hired," Pl.'s Mem. at 14, a week before the layoffs, Songer Steel hired three more white laborers, thereby decreasing the percentage of its black labor workforce to 10.8% (4 out of 37 were now black), *id.* at 14; Pl.'s Stat. Facts ¶ 45; Def.'s Ex. F.[13]

Moreover, Plaintiff notes that Songer Steel's November 4, 2010 layoff of Mr. Smiley, Mr. McClung, and Mr. Pierce cut the number of black laborers on the project roughly in half, thereby decreasing the percentage of blacks on the Project to 5.8% (2 out of 34 were now black). *See* Def.'s Stat. Facts ¶ 21.[14] These raw, non-analytical statistics from both parties are not particularly compelling in either direction, but in any event, Plaintiff's demonstration of inconsistencies in Songer Steel's proffered statistics further points to record evidence that could support a reasonable factfinder concluding that Songer Steel's proffered legitimate reason for its

---

[13] Songer Steel's Employee List classifies the three white laborer hires as follows: Mr. Gregory Demko-LBF (Laborer Foreman), Mr. Edward Kuc-LBJ (Laborer Journeyman), Mr. Richard Pierce-LBJ, such that it strikes the Court that only two out of these three newly hired white laborers were similarly situated to Mr. Smiley as second shift journeyman laborers.

[14] The Court would reach the same conclusions in this case even in the absence of these proffered statistics, and addresses them only out of completeness to the arguments presented.

adverse treatment of Mr. Smiley was "unworthy of credence" and therefore infer that Songer Steel did not act for its asserted non-discriminatory reason. *See Fuentes*, 32 F.3d at 765.

After considering the record as a whole, the Court concludes that Plaintiff has identified such "weaknesses" and "inconsistencies" in Songer Steel's proffered legitimate reasons for its adverse treatment of Mr. Smiley that a reasonable factfinder could rationally find these reasons "unworthy of credence," and therefore infer that Songer Steel did not act on the basis that it claims, such that by permissible inference, Mr. Smiley's race was a substantial motivating factor in Songer Steel's decision about his employment. Simply put, Plaintiff has advanced sufficient record evidence for the pretext issue to go to the jury. Therefore, Defendant's Motion for Summary Judgment is denied as to all Counts.

### III.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 20, is denied. An appropriate Order will follow.

Mark R. Hornak
United States District Judge

Dated: February 26, 2014

cc: All counsel of record